MERCHANTS TRANSFER & STORAGE CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 12351, 13105, 13282, 30906, 36227. Promulgated September 18, 1929.

*Robert A. Littleton*, *Esq.*, and *James A. Councilor*, *C. P. A.*, for the petitioner.

*John D. Foley*, *Esq.*, for the respondent.

292

298

MARQUETTE: The petitioner pleads the bar of the statute of limitations against the deficiency asserted by the respondent for 1917, and avers that the bar is not lifted by a waiver, or consent agreement, executed after the period limited by statute. The facts upon which the petitioner relies in support of its plea are set out in the findings of fact and need not be repeated here. The questions of law presented by the petitioner's plea and averment have heretofore received the consideration of this Board in *Joy Floral Co.*, 7 B. T. A. 800, and again, since the reversal of our decision in that case by the Court of Appeals of the District of Columbia, 29 Fed. (2d) 865, in *Wells Brothers Co. of Illinois et al.*, 16 B. T. A. 79. Our conclusions in the matter are clearly set forth in our opinion in the latter case, and no extended discussion will serve any useful purpose here. In our opinion the waivers or consents relating to the year 1917 are valid and serve to extend the period for assessment and collection of the tax for that year. Since the deficiency notice was mailed by the respondent within the statutory period as extended by the waivers, or consent agreements, of January 11, 1924, and December 23, 1925, assessment and collection of any tax found due for 1917 are not barred. This disposes of the first three assignments of error in Docket No. 13282.

The petitioner complains of respondent's action in reducing invested capital of the years 1917 to 1921, inclusive, by $60,094.17, on account of alleged inadequate depreciation charged off on the books from 1901 to 1916, inclusive, and in further reducing invested capital of the years 1918 to 1921, inclusive, by $4,356.15, on account of additional depreciation allowed for 1917. The petitioner's policy as to the writing off of depreciation of its physical assets on the books is clearly disclosed by the findings of fact. It involved the practice of offsetting appreciation against depreciation, a practice which is clearly erroneous. Prior to 1913 no depreciation was charged off in respect of the main warehouse building, because it was believed that the excess of the fair value of this building over its actual cost more than exceeded any depreciation sustained. Subsequent to 1913 some depreciation in respect of this building was charged off on the books, but how much, and upon what basis, we do not know. Neither do we know anything about the petitioner's depreciation policy as it relates to stables and garage and wheelright shops, nor as to the amounts of depreciation that have been charged off on the books, if any, in respect of these buildings. As to horses and delivery and transfer equipment, depreciation was determined by the inventory method under which unrealized increases in values were offset against decreases in values due to wear, tear and exhaustion. It is not denied

by the petitioner that all of these depreciable assets have suffered, more or less, from wear, tear and exhaustion, but asserts that its practice, as regards the writing off of depreciation, has resulted in entirely adequate provision being made for all depreciation sustained. That assertion, however, is entirely refuted by the evidence, which reveals that unrealized appreciation has been used to offset depreciation, a practice not countenanced by the statute. Cf. *City National Bank*, 2 B. T. A. 623, and *Alexandria Paper Co.*, 3 B. T. A. 239. There are no facts in the record which challenge the correctness of the respondent's determination as to the amount by which each year's invested capital must be reduced on account of depreciation sustained; hence, we shall not disturb the respondent's determination in that respect. This disposes of the fourth assignment of error in Docket No. 13282, the second assignment of error in Docket No. 12351, and the second assignment of error in Docket No. 13105.

Petitioner alleges that respondent has erroneously disallowed $9,954.73 of the whole deduction claimed in the return of 1921 as depreciation of heavy hauling equipment. No evidence was presented to the Board in support of this assignment of error; and, accordingly, we shall not disturb the respondent's action. This disposes of the first assignment of error in Docket No. 13105.

Complaint is also made by the petitioner that respondent disallowed the deductions claimed in the return for 1922 for depreciation of heavy hauling equipment and parcel delivery equipment, and that respondent redetermined the allowance for depreciation in respect of those assets "on a straight line basis." It complains, further, that respondent disallowed $5,451.87 of the whole amount of depreciation on buildings claimed in the return, the result of reducing the annual rate adopted by the petitioner. The petitioner presented no proof that the depreciation allowed by the respondent in respect of heavy hauling and parcel delivery equipment and buildings is not a reasonable allowance. We apprehend that the fact that the respondent determined the depreciation deduction in respect of heavy hauling and parcel delivery equipment by another method than that used by the petitioner offers no cause for disturbing the respondent's action in the absence of proof that the allowance made by the respondent is not reasonable within the meaning of the statute. This disposes of the second and third assignments of error in Docket No. 30906.

At page 60 of the brief filed by counsel for the petitioner, after the hearing, is the following statement:

There is not sufficient evidence in the record to warrant the Board in disturbing the action taken by the respondent for the years 1924 and 1925, and the petitioner here and now abandons any further protest of the respondent's action for those years and requests the Board to approve for assessment the defi-

ciencies proposed to be assessed in the respective amounts of $800.82 for the year 1924, and $621.63 for the year 1925.

The foregoing statement constitutes an abandonment of all of the issues raised in Docket No. 36227.

Petitioner alleges that respondent erred in refusing to allow a deduction, for each of the years 1918, 1919, and 1920, for the amortization of a building erected subsequent to April 6, 1917, and used in the production of articles contributing to the prosecution of the war against the German Government. The building in question is the six-story reenforced concrete warehouse of factory type construction erected for the petitioner by the Samuel J. Prescott Co., in 1917 and 1918, in the rear of the main warehouse at 920 E Street, Northwest, at a total cost of $89,407.42. The petitioner contends that this building was erected at the request of the Government, and under threat of the exercise of the right of eminent domain; that the building was used by the Ordnance Bureau of the War Department for the production of articles (portable field machine shops) contributing to the prosecution of the war; and that these circumstances bring it within the provisions of section 234 (a) (8) of the Revenue Act of 1918.

As to the contention that this building was erected at the request of the Government, the petitioner's president testified as follows:

Q. After you had gotten this 20-foot strip, was there any change in the plans for the garage?

A. We planned that we might put up a three-story garage. It was all on a cost plus basis so that we could go as far as we wanted to, and we made plans for a foundation for a three-story garage. We figured that the economic proposition was a two-story garage, and that was our definite idea.

Q. Now, when were your plans for constructing a two-story garage and the possibility of a subsequent story on that two-story garage, changed from a garage to another kind of building?

A. The moment that we started in and had our permits, the Government, apparently on the job, came in and we were importuned from various sources, the War Department, the Treasury Department, and various Bureaus of the Government,—"Why build a two-story garage as you have planned here. We have got to have facilities. We are in war. Be patriotic and put us up what we want, and change from a two-story garage building for your own purposes and put up a fire-proof factory type of a warehouse."

Q. When the Government demanded that you change your plans, then what plans were made with reference to the plans for construction of a garage—what changes were made?

A. In our plans?

Q. Yes.

A. Why, we put in foundations to carry up a six-story building, and we figured to carry it as far as the economic conditions for the height of the building would regulate in our property.

Q. Prior to the time of the change to a six-story building, that is erecting a six-story building, what work had been done with reference to constructing the two-story garage that you had originally planned?

A. Just the foundation had been started and the excavation work which was necessary.

Q. Was it necessary to change your plans for the foundation at that time?

A. It was necessary to change our plans, absolutely. You have to carry the weight and the height.

There is much in the documentary evidence which, standing entirely unexplained, refutes much of this testimony. In the first place, it will be noted from this testimony that it was after the permit for the construction of the building had been secured from the Building Division of the District of Columbia, that the Government is alleged to have approached the petitioner in the matter of constructing a six-story building instead of a two-story garage; and that change was made in the foundation plan, to one capable of supporting a six-story structure, after excavation work had been completed and foundation work started, and after the petitioner was approached by the Government. That the matter of constructing a six-story building was under consideration, or at least the subject of discussion, before the Government had any knowledge as to the petitioner's plans, is evident from the estimate of the cost of construction submitted in writing by the Samuel J. Prescott Co., under date of August 4, 1917, in which an estimate is given of the additional cost in case the building was to be constructed so as to permit of the later addition of one, two, three, or four stories. This estimate was made more than three weeks before the first permit for any operations was issued by the Building Division. To be exact, the date of that permit is August 28, 1917. Moreover, petitioner's order to the contractor to proceed with the construction of the building contained the provision " Building to be fire-proof, three stories in height, provision in foundation for an additional three stories." That order was dated August 16, 1917, twelve days before the first permit was issued by the Building Division. This documentary evidence clearly refutes the testimony that any change in the foundation plan was necessitated by virtue of the Government's alleged request that the petitioner construct a six-story building. Furthermore, the estimate of the contractor of August 4, 1917, and the petitioner's order to the contractor of August 16, 1917, to proceed with construction, indicate that the plan for a foundation capable of supporting a six-story structure had been adopted as a part of the construction program before the Government had any knowledge of petitioner's plans, if that knowledge was obtained, as the testimony states, after the issuance of the building permit.

Also, we have in evidence a letter from the contractor to the petitioner, dated November 20, 1917, advising that construction was progressing satisfactorily and that, " I will have the building roofed in next week and completed the following week," and further setting

forth the estimate of the cost of erecting the three additional stories. This letter indicates that up to the time the contractor was prepared to roof the building, no decision had been made to add the three additional stories; and this does not coincide with the testimony that the plan of construction was changed to a six-story building at the time the foundation was being laid.

Finally, we have the resolution of petitioner's own board of directors, adopted at the meeting of March 19, 1918, authorizing the president to rent the "new six-story building" to the Government, at an annual rental equal to approximately 40 per cent upon the investment, notwithstanding that "to deprive the Company of the use of the new building for the purposes for which it was constructed would interfere with the economical operation of the new business and entail substantial loss to the Company." If this resolution means anything, it is that the building was not constructed at the Government's request, but that it was erected to meet the petitioner's needs and for the economical operation of "new business"; and in our opinion after examining all of the documentary evidence, this resolution more nearly exhibits the entire situation, as concerns the construction of this building, than the testimony of the president.

The fact that the building was used by the Ordnance Bureau of the War Department during the period of its occupancy, for the production of portable field machine shops, and, in that respect, for the production of articles contributing to the prosecution of the war, is not sufficient to bring the petitioner within the amortization provisions of the statute. We have already expressed the opinion that the building was constructed to meet the needs of petitioner's business, anticipated but apparently unrealized needs; and in the erection of the building there was not a purpose to devote it, either in whole or in part, to the production of articles contributing to the prosecution of the war, nor was it ever devoted to such use by the petitioner. On the other hand, following completion, or possibly before the building was entirely completed, the petitioner authorized its rental to the Government at an annual rental which represented a return of approximately 40 per cent upon its investment, and it was the Government, not the petitioner, which used the building for the production of articles contributing to the prosecution of the war. This brings the petitioner squarely within our decision in *Moore Investment Co.*, 2 B. T. A. 579, as well as that in *Bryant & Detwiler Co.*, 3 B. T. A. 15. In the former case we stated:

It seems clear to the Board that Congress did not have in mind affording any relief by the amortization section to those taxpayers who did not produce or manufacture articles contributing to the prosecution of the war, but who erected or acquired buildings for the purpose of investment or for the purpose of renting to manufacturers who were engaged in the production of articles contributing to the prosecution of the war.

The rule there announced is equally applicable to the case at bar, and we hold the respondent committed no error in denying to the petitioner any deduction for amortization of the building in question. This disposes of the first assignment of error in Docket No. 12351.

The third assignment of error in Docket No. 13105 is that respondent has erroneously reduced invested capital of 1921, by deducting additional taxes found due, but which the petitioner claims to be excessive. The assignment of error sets forth " The question of the correctness of these additional taxes are now before this Board [Docket No. 12351]." The two assignments of error in Docket No. 12351 have been decided favorably to the respondent; and, since the petitioner has not offered any proof that this action of the respondent is not correct, this assignment of error must also be decided favorably to the respondent.

The last assignment of error to be decided is the first in Docket No. 30906, that respondent erroneously disallowed the deduction for 1922 of a contribution of $500 to the Shriners' convention. This contribution was made with the belief and expectation that the petitioner would be directly benefited through increased business if the convention was held in Washington. Not an officer of the petitioner was or is a member of the organization which the petitioner refers to as the " Shriners." The contribution was made solely for business purposes; and it had the result hoped for to a large extent. The contribution constituted an ordinary and necessary expense of doing business, and the respondent erred in disallowing the deduction. *Anniston City Land Co.*, 2 B. T. A. 526; *Ranier Grand Co.*, 11 B. T. A. 520; *Hotel Patten et al.*, 13 B. T. A. 943.

> *Judgment will be entered for the respondent for the years 1917, 1918, 1919, 1920, 1921, 1924, and 1925. Judgment for the year 1922 will be entered under Rule 50.*